**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| GREGORY J. TURLEY, #N-08083, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-07-SCW |
| | ) | |
| DANNY BEDINGER, et al., | ) | |
| | ) | |
| Defendants, | ) | |

### DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONLUSIONS OF LAW

The defendant, JAQUELINE LASHBROOK, by and through her attorney, Lisa Madigan, Attorney General of the State of Illinois, for her proposed findings of fact and conclusions of law, states as follows:

### INTRODUCTION

The plaintiff, Gregory Turley #N-08083, brings the instant action pursuant to 42 U.S.C. § 1983 claiming a violation of his Eighth Amendment rights at Menard Correctional Center. Specifically, the plaintiff claims the size of the cells in the North One Cell House ("N1"), because double celled, coupled with a lack of out of cell time, have caused a serious medical condition to the plaintiff which should preclude his re-assignment to the N1 cells. At the jury trial held in June 2016, the plaintiff's claim for damages was dismissed as the defendants were entitled to qualified immunity. Now, after an additional evidentiary hearing, the question of injunctive relief is to be decided.

### PROPOSED FINDINGS OF FACT

The plaintiff, Gregory Turley #N-08083, is currently incarcerated within the Illinois Department of Corrections ("IDOC") at Menard Correctional Center ("Menard").  The plaintiff

has been incarcerated within IDOC since 1991.  The plaintiff has spent the bulk of his incarceration at Menard. While incarcerated at Menard, the plaintiff spent two periods housed in N1; once in 2005 and again in 2014.  The plaintiff is not currently housed in N1, nor is there any evidence of any plans for his return.

**Cells in the North One Cell House**

In the past N1 was used for segregation, but has since been converted for general population as well as one level of protective custody. Cells in N1 are approximately 50 square feet.  Cells in N1 are double celled and utilize bunk beds. The cells contain a working toilet and sink. Offenders are also permitted to use fans. The cells in N1 are tall enough for an inmate to stand upright and provide enough space for an inmate to stretch out. The plaintiff testified during his jury trial that there was sufficient space to exercise in the N1 cells, but that he chose not to exercise in order to be considerate to his cellmate.

**Out of Cell Time**

Currently, offenders housed in N1 have numerous opportunities for out of cell time. Offenders receive approximately 6.5 to 9.5 hours of exercise yard time per week, depending on the level in which they are housed in N1. Offenders also receive approximately 2 hours of gym time per week. Offenders receive meals in the cafeteria twice per day which requires them to leave their cell for approximately 40 minutes for each meal.  Offenders also are permitted to apply for employment within the facility. Offenders who are employed within the facility can work, out of their cell, for 6-8 hours per day, each day of the week. The plaintiff, currently employed, works approximately six hours per day, seven days per week, all of which is performed out of his cell. Offenders also receive regular time out of their cells for religious services, educational classes, commissary visits, and haircuts, as well as various other activities.

**Lockdowns**

Lockdowns occur when the Warden of the facility determines that a potentially dangerous situation exists. Once a lockdown has been issued, the facility will remain on lockdown until the IDOC officials are given the instruction to end the lockdown. Lockdowns require restricted offender movement within the facility, requiring offenders to remain in their cells most of the time. In the past, these lockdowns could last several weeks. In recent years the duration of lockdowns has greatly diminished, now lasting less than a week. The ability for the facility to reduce lockdown time is a result of increased staffing and improved protocol.

**The Plaintiff's Medical Condition**

The plaintiff is over the age of 55. He testified that he was formerly an avid long distance runner frequently running several miles at a time. The plaintiff is not a doctor. The plaintiff's medical records indicate that he had been diagnosed with symptoms of anxiety before being housed in N1. The plaintiff claims he has suffered from anxiety while incarcerated which allegedly worsened in N1. The plaintiff did not provide any expert medical testimony that the cells in N1 caused the plaintiff's worsened condition. The plaintiff's largest flaw with the cells is that they made him feel "trapped." The plaintiff further alleged that his time in N1 left him with knee pain in that he was unable to exercise to the extent required to stave off the effects of arthritis. The plaintiff lists various other discomforts such as irritable bowel syndrome as being caused or worsened by the cell.

**Deliberate Indifference**

No medical expert testimony was provided that it was the cell itself that caused any of the plaintiff's medical conditions. The plaintiff's medical records and the testimony indicate that the plaintiff has received medical treatment and mental health treatment on a regular basis as needed.

The plaintiff has not alleged that he suffered from inadequate medical treatment. The plaintiff admitted that he had never been told by a medical professional that any of his medical conditions were caused by his cell in N1. The plaintiff bases his medical analysis and health requirements on his own lay opinion. There was no testimony to indicate that any medical professional at Menard has ever concluded that the cells in N1 pose a substantial risk of serious harm to any inmate including the plaintiff. There is no evidence that any medical professional at Menard ever concluded that the plaintiff's cell in N1 ever actually caused an injury to the plaintiff.  The record does not indicate that any medical professional at Menard ever told any defendant or other prison official that the cells in N1 posed a substantial risk of medical harm to the inmates housed therein. No evidence was provided that any defendant or prison official had knowledge that the cell in N1 caused a serious medical condition for the plaintiff or that to return the plaintiff to N1 would present a substantial risk of harm to the plaintiff. Had any serious risk of harm due to the cells in N1 been brought to the attention of defendant Lashbrook, she would have acted to correct the issue. The plaintiff has not proved that any prison official had actual knowledge that the plaintiff faced a substantial risk of serious harm from the conditions the plaintiff experienced in the cells in N1 at the Menard Correctional Center. Plaintiff has also not proved that he suffers from a particular vulnerability of which any prison official was aware that would cause him to face a substantial risk of serious harm in N1.

**Defendant Lashbrook**

Defendant Lashbrook has been the Warden of Menard since January 2017. She is aware of the plaintiff but has no knowledge as to the plaintiff's medical conditions. Defendant Lashbrook has seen the cells in N1, but has never been notified by any medical professional that these cells

pose a health risk to inmates housed there. Defendant Lashbrook has never been informed by any medical professional that the cells in N1 pose a risk to the plaintiff's health.

## PROPOSED CONCLUSIONS OF LAW

### I.   THE PLAINTIFF DID NOT MEET HIS BURDEN FOR ISSUANCE OF A PERMANENT INJUNCTION.

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). It is the plaintiff's burden to establish that: (1) he has suffered irreparable injury; (2) the remedies available at law are inadequate to compensate him for that injury; (3) the benefits of granting the injunction outweigh the injury to the defendants; and (4) the public interest would not be harmed by a permanent injunction. *Id.*; *see also ADT Security Svcs Inc. v. Lisle-Woodridge Fire Protection Dist.*, 672 F.3d 492, 498, (7th Cir. 2012), *citing Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003). In addition, a plaintiff must ultimately be able to succeed on the merits of his claim. *E.g., Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996).

As will be described more fully below, the plaintiff did not prove his claims under the Eighth Amendment. The plaintiff has also not met his burden of proving the necessary elements for the imposition of injunctive relief.

### A. The plaintiff failed to meet his burden to prove his Eighth Amendment claim for deliberate indifference.

It was the plaintiff's burden in this case to prove that defendant Lashbrook or any prison official presently knows that the plaintiff faces a substantial risk of serious harm if double celled in N1 and are indifferent to a substantial risk that the plaintiff will again be housed under those conditions. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The Eighth Amendment prohibits the

infliction of "cruel and unusual punishments". *U.S. CONST. amend. VIII*. This prohibition is applicable to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962). The "constitutional scienter requirement for an Eighth Amendment conditions-of-confinement claim is deliberate indifference." *Del Raine v. Willford*, 32 F.3d 1024. The Supreme Court in *Farmer* clearly defined the term "deliberate indifference" ruling that to violate the Eighth Amendment, a deprivation must objectively be sufficiently serious to result in the denial of the minimum civilized measure of life's necessities. 511 U.S. 825, 834. Furthermore, the prison official must subjectively have a sufficiently culpable state of mind. *Id.* at 834-39 (rejecting the proposition that deliberate indifference could be measured solely by an objective test). The objective component of deliberate indifference is met only when the official knows of and disregards an excessive risk to inmate health or safety. *Id.* at 837. The official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must actually draw that inference. *Id.*; *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (noting that the "requirement of subjective awareness tethers the deliberate-indifference cause of action to the Eighth Amendment prohibition of cruel and unusual punishment").

Mere negligence is not enough to state a claim of deliberate indifference under the Eighth Amendment, *Daniels v. Williams*, 474 U.S. 327, 332 (1986), and it is also insufficient to show that a prison official merely failed to act reasonably, *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995).

### i. The plaintiff did not prove that the cells in N1 caused the plaintiff to suffer from an objectively serious deprivation.

The plaintiff's claim fails the objective prong of the Eighth Amendment analysis because the evidence before the court does not establish that the conditions of the plaintiff's cell objectively

6

present a substantial risk of serious harm. Because the evidence does not prove that defendant Lashbrook or any prison official knew of a substantial risk of serious harm to the plaintiff personally, the court must examine the conditions the plaintiff has raised as objectively serious deprivations to determine if possible constitutional violation exists. The objective analysis examines whether the conditions of confinement exceeded contemporary bounds of decency of a mature civilized society. *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). The plaintiff has raised three issues with the cells that should be analyzed: 1) the size of the cells; 2) the double occupancy of the cells; and 3) the limited hours of out of cell time.

### 1. The plaintiff has no constitutional right to a certain square footage of cell space.

No inmate, the plaintiff included, is entitled to a specific minimum square footage of cell space. In discussing cell size, no court has ever provided a constitutional minimum requirement of cell space. In *Rhodes v. Chapman,* 452 U.S. 337 (1981), the United States Supreme Court reviewed the limitations the Eighth Amendment placed on the conditions in which a state may confine a prisoner and held constitutional the double celling of inmates in a 63 square foot space originally designed for one inmate. The Supreme Court recognized that "[c]onfinement ... is a form of punishment subject to scrutiny under the Eighth Amendment standards," and that the reviewing court must look to whether the circumstances of the inmate are such that they "either inflict[ ] unnecessary or wanton pain or [are] grossly disproportionate to the severity of crimes warranting imprisonment." *Id.* at 345. However, there is no test for courts determine whether conditions of confinement are cruel and unusual, because the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id* at 346. Furthermore, the constitution does not mandate comfortable prisons. *Id* at 349. Indeed, "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal

offenders pay for their offenses against society." *Id* at 347. In concluding that no Constitutional right had been violated by double celling, the Court also cautioned that, "these considerations properly are weighed by the legislature and prison administration rather than a court." *Id.* at 349. "In assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility. *Id* at 351 (citing *Bell v. Wolfish*, 441 U.S., at 539). While courts do have a responsibility to scrutinize claims of cruel and unusual punishment, they "cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system…" *Rhodes* at 352.

A number of courts have reviewed constitutional challenges to cell size in light of *Rhodes,* and found varying sizes of cells constitutional. *See, e.g., Keenan v. Hall,* 83 F.3d 1083, 1091-92 (9th Cir.1996) (providing that the constitution does not guarantee an inmate more than the 54 square feet he was provided in his cell); *Schwartz v. Zavaras,* No. 96-1131, 1996 WL 494413, at *2 (10th Cir.(Colo.) Aug. 27, 1996) (affirming that a cell of 54 square feet was constitutional for an individual housed in administrative segregation); *Dohner v. McCarthy,* 635 F.Supp. 408, 425 (C.D.Cal.1985) (holding that double celling in a 99 square foot cell is constitutional, even though cell size is greatly reduced when the second bed is lowered); *Watson v. Ray,* 90 F.R.D. 143, 149 (S.D.Iowa 1981) (upholding constitutionality of 48 square foot cell for general population inmates); *Peterkin v. Jeffes,* 855 F.2d 1021, 1026-27 (3rd Cir.1988) (upholding district court's finding that 71 square feet and 60 square feet for cells housing death row and administrative segregation inmates to be more than constitutionally adequate); *Kunze v. Bertschi,* 477 F.Supp.2d

1038 (D.N.D. 2007) (finding as a matter of law, that a cell does not violate the Eighth Amendment to the Constitution whether the cell was 35 square feet or 55 square feet.) While the American Correctional Association places requirements on cell size beyond those offered in N1, the Supreme Court in *Bell v. Wolfish*, found that recommendations from groups such as these "do not establish the constitutional minima," 44 U.S. at 543. In fact, here in the Southern District of Illinois, the Court acknowledged that it "is unaware of any standards that mandate a minimum square foot area that must be provided for each inmate." *Brzowski v. Illinois Dep't of Corr.*, No. 15-CV-173-SMY, 2015 WL 1228916, at *2 (S.D. Ill. Mar. 16, 2015). Because the plaintiff failed to prove an Eighth Amendment violation, and because no constitutional right of a minimum requirement of cell space exists, the plaintiff's claim for an Eighth Amendment violation based on the size of his cell must fail.

### 2.   Double celling does not create a constitutional violation.

On the issue of double celling, the Supreme Court in *Rhodes* again provides the guiding light, finding double celling not to be unconstitutional. 452 U.S. at 347. There the Court, while analyzing directly similar cell conditions such as double celling and length of time in the cell stated, "[a]t most, these considerations amount to a theory that double celling inflicts pain." 452 U.S. at 348-349. "There being no constitutional violation, the District Court had no authority to consider whether double celling in light of these considerations was the best response to the increase in Ohio's statewide prison population." *Id.* at 349-350. In *Smith v. Fairman,* the Seventh Circuit pondered whether a double cell offering 55 to 65 square feet was unconstitutional and upheld the practice of spending 20 hours a day in the double cells since the inmates were still receiving adequate food, medical care, and the conditions were sanitary. 690 F.2d 122, 124-126.

Here, there is no indication that the plaintiff experienced inadequate food, medical care, or unsanitary conditions while housed in N1.

### 3.   Offenders in N1 receive sufficient out of cell time.

While the plaintiff contends that offenders in N1 are provided insufficient out of cell time, nothing in the record supports that proposition. Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened. *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). The plaintiff contends that he requires additional exercise time in order to prevent or treat his knee pain. However, opportunities to exercise that are merely less than desirable do not implicate this constitutional right. *Turner v. Hamblin*, No. 12-CV-179-BBC, 2012 WL 3070684, at *5 (W.D. Wis. July 30, 2012). Further, the plaintiff testified that his cell in N1 did provide enough space to exercise, but that he refrained out of consideration for his roommate citing the less than desirable presence of perspiration.

Offenders in N1 have plethora of out of cell opportunities. They may have jobs at the facility which can provide them with 5-8 hours per day, 7 days a week out of their cell. Offender's in N1 are also provided with recreation time including 6.5 to 9.5 hours of exercise yard time per week and 2 hours of gym time per week. Offenders are given meals out of their cell twice per day. They go to the chapel, educational classes, the library, commissary, the barber, and the shower. Menard is absolutely rife with out of cell possibilities for offenders housed in N1 and the plaintiff's contention that if returned to N1, he would suffer from insufficient out of cell time, is without merit. Furthermore, the evidence establishes that inmates housed in N1 are receiving considerable out of cell time during which the plaintiff could exercise his knee.

As for the issue with lockdowns, while they do occur, and require offenders to remain cell for the better part of the day, the staff at Menard has been able to reduce both their frequency and duration. Furthermore, the plaintiff's claim is that the cells in N1 are constitutionally insufficient due to his personal, medical and mental condition. Even during lockdowns the opportunity for some in-cell exercise exists, as the plaintiff admitted.

### ii. The plaintiff did not prove that his cell conditions in N1 caused a serious medical condition.

The plaintiff claims that because he was housed in N1, he suffered from anxiety which he described multiple times as a feeling of being "trapped." Such a feeling cannot be unusual for person incarcerated in a maximum security prison. The plaintiff also claims that he suffers from knee pain (for which he must exercise), and various other discomforts including irritable bowel syndrome. The plaintiff ascribes his maladies specifically to the conditions in N1. The extent of the plaintiff's evidence to prove that it was the cell in N1 itself that actually caused his medical and mental health issues was the plaintiff's own lay opinion. However, the plaintiff, who has no medical training, provided no basis to support his conclusion. This makes the plaintiff wholly unqualified to provide credible testimony as to the actual cause of his condition. In *Goffman v. Gross*, a case where the plaintiff claimed that the second hand smoke he endured in his cell at the hands of his smoking cellmate caused a serious medical condition, the plaintiff used four other inmates' testimony to attempt to prove causation. The Seventh Circuit, in affirming the district court's judgment for the defendants stated, "the medical effects of secondhand smoke are not within the ken of the ordinary person, so these inmates' lay testimony by itself cannot establish the showing of medical causation…" 59 F.3d 668, 672. "Given the absence of any countervailing medical evidence, the finding that Goffman failed to establish the existence of a serious medical

condition exacerbated by cigarette smoke was not only plausible, it was for all practical purposes required." *Id.*

Similarly, in this case, the plaintiff's reliance on his own lay opinion testimony is insufficient to show causation of medical or mental health issues. For instance, there is no medical evidence that the plaintiff's anxiety was caused by his cell in N1 and is not merely a symptom of general imprisonment in a maximum security prison. In addition, the plaintiff speculates that his knee pain was caused by his N1 cell, despite the lack of any medical evidence. The same issue persists with the plaintiff's irritable bowel syndrome. Again, the plaintiff contends that the cell in N1 caused the issue but failed to provide any explanation as to how. While the plaintiff is competent testify that he felt his conditions either begin or worsen while in N1, he is not competent to testify that it was his cell in N1 that actually caused his conditions to either begin or worsen. The evidence to prove that the cell in N1 actually caused the plaintiff's medical or mental health conditions must have come in the form of expert testimony, of which the record is entirely devoid. At most, the plaintiff has testified that he was uncomfortable living in N1, but not that his constitutional rights were violated.

### iii. The plaintiff did not prove that defendant Lashbrook or any prison official has the culpable mind set necessary to establish deliberate indifference.

While the Supreme Court in *Rhodes* laid out the analysis for objective prong of the deliberate indifference discussion, the court in *Wilson v. Seiter*, reminds us that the objective component is but one of a two pronged analysis; the second being the culpable mind set. 501 U.S. 294, (1991). "An inquiry into a prison official's state of mind is necessary when it is claimed that the official has inflicted cruel and unusual punishment. *Id.* at 299. The source of the intent requirement is the Eighth Amendment, itself. *Id.* at 300. "If the pain inflicted is not formally

meted out as punishment, by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify [as punishment]." *Id.*  The *Wilson* Court noted:

> "The United States suggests that a state-of-mind inquiry might allow officials to interpose the defense that, despite good-faith efforts to obtain funding, fiscal constraints beyond their control prevent the elimination of inhumane conditions. Even if that were so, it is hard to understand how it could control the meaning of "cruel and unusual punishments" in the Eighth Amendment. An intent requirement is either implicit in the word "punishment" or is not; it cannot be alternately required and ignored as policy considerations might dictate."

*Id.* at 301-02.

Deliberate indifference is equivalent to criminal recklessness.  *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015).  It requires a finding that the defendant knew of a substantial risk and consciously disregarded it.  *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).  To be guilty of deliberate indifference, defendants must know they are creating a substantial risk of harm.  *Billman v. Indiana Department of Corrections*, 56 F.3d 785, 788 (7th Cir. 1995). "[t]he offending conduct must be wanton." *Wilson*, 501 U.S. 294, 302.

Indeed, the Court in *Wilson* rejected a reading of the Eighth Amendment that would allow liability to be imposed on prison officials solely because of the presence of objectively inhumane prison conditions. *Id.* at 299-302. Accordingly, "[a] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847, (1994). This type of deliberate indifference "implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Duckworth v. Frazen*, 780 F.2d 645, 653 (7th Cir. 1985).

13

Here, not only has the plaintiff failed to provide sufficient evidence that the cells in N1 actually caused a serious harm or that to return to those cell would present a substantial risk of serious harm, but the plaintiff has also failed to prove that defendant Lashbrook or any prison official *knows* that the N1 cells pose a significant risk of serious harm to the plaintiff. Defendant Lashbrook testified that no medical personnel has ever informed her that the conditions in N1 present a medical risk to the offenders housed there. Defendant Lashbrook has never been informed by any medical expert that the cells in N1 present a substantial risk of serious harm or that the plaintiff has some condition that would preclude his placement in N1. There is also no evidence that any prison official has been notified by a medical professional that the cells in N1 present a substantial risk of serious harm to the plaintiff.

Furthermore, had any medical professional ever told defendant Lashbrook the cells in N1 present a substantial risk of serious harm to the plaintiff, she would have corrected it. Absent a recommendation from any medical staff of a substantial risk of harm presented by the N1 cells, neither defendant Lashbrook nor any prison official can be expected to act.

### B. The plaintiff has not shown that he will suffer irreparable injury without an injunction.

The plaintiff is tasked with establishing that he will suffer irreparable injury without the issuance of an injunction.  This requires a showing that harm is likely as opposed to a mere remote possibility.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The plaintiff has not met his burden.

First, the plaintiff did not establish that his cell in N1 actually caused irreparable harm. Second, the plaintiff has not established any likelihood of his imminent return to N1. As explained above, the plaintiff's claim that his cell in N1 was the cause of his ailments was based solely on his opinion testimony. There has been no expert medical testimony to prove that the plaintiff's

medical or mental conditions were caused by his cell in N1 alone. Second, the plaintiff has provided no evidence that his return to N1 is likely. While no doubt there is a possibility of the plaintiff's return to N1, there is no evidence to suggest that it rises above a mere remote possibility. Therefore, the plaintiff has failed to meet his burden that injunctive relief is necessary to avoid irreparable harm.

### C. The plaintiff failed to establish that the benefits weigh in his favor or the public interest will not be harmed.

The plaintiff is also tasked with establishing both that the benefits weigh in the favor of granting him injunctive relief and that such entry would not harm the public interest. The plaintiff has not met his burden for these prongs. This case is similar to *Siler v. Green*, where an inmate sought but was denied injunctive relief related to his medical care. 2009 WL 1393411 (E.D. Mich. May 18, 2009). There, the court found that granting an inmate's motion for preliminary injunction would harm the orderly operation of the prison and that the inmate failed to show it was in the public interest to grant his motion. *Id*. at 3. The court wrote that it was "ill-suited to make preliminary decisions based on conflicting medical evidence which would interfere with the operation of the prison medical system. *Id*. It also found that: "The public would not be served by the Court ordering what might be unnecessary medical treatment or referrals." *Id*. The Supreme Court has long held that: "The federal courts do not sit to supervise state prisons, the administration of which is acute interest to the States." *Meachum v. Fano*, 427 U.S. 215, 229 (1976). The plaintiff has not provided evidence sufficient to show that the injunction will not harm the orderly operation of the prison or is in the public interest.

**D. The limits imposed by the Prison Litigation Reform Act render the plaintiff's specific requests for relief unavailable.**

The Prison Litigation Reform Act (PLRA) provides additional limits on the injunctive relief the plaintiff may receive in a federal suit.  *See* 18 U.S.C. § 3626(a)(1)(A).  Under the Prison Litigation Reform Act,

> "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."

18 U.S.C. § 3626(a)(1). "The term 'prospective relief' means all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7); *see also, Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012).  In *Westefer*, the Seventh Circuit Court of Appeals found that a district court's "highly specific" requirements in the injunction failed to conform to the PLRA.  *Id*. at 686 ("This is not the narrow tailoring that the PLRA requires.")

For instance, if the court were to find that the defendant or other prison official had actual knowledge of a substantial risk of serious harm caused by anxiety resulting from the confined space, in granting narrowly tailored relief, the court must recognize the choice of how to alleviate the constitutional violation, such as treatment of his anxiety versus moving him to a different cell, would fall to the Department of Corrections staff, not the court.

The plaintiff is an inmate who filed a federal action concerning prison conditions. Accordingly, the PLRA applies to him.  Here, the plaintiff's request for injunctive relief goes well beyond what is constitutionally mandated.  The plaintiff seeks to make his own determination of where he is housed based on his own preference.  The plaintiff is not entitled relief which prohibits

defendants from housing the plaintiff in a specific cell house because such relief would be prohibited by the PLRA.

## II.   THE PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF IS BARRED BY THE ELEVENTH AMENDMENT BECAUSE THERE IS NO CONSTITUTIONAL VIOLATION TO REMEDY.

For purposes of this action, sovereign immunity is the privilege of the State not to be sued without its consent. *Va. Office for Prot. And Advocacy v. Stewart*, 131 S. Ct. 1632, 1637 (2011). The Eleventh Amendment expressly recognizes the limitations on the jurisdiction of the federal courts imposed by the sovereignty of the States, *see Alden v. Maine*, 527 U.S. 706, 729-30 (1999), and thus, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). More simply, sovereign immunity extends to prohibit all suits by an individual against a State in federal court, irrespective of the relief sought. *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (1998).

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court established a limited exception to a State's sovereign immunity in cases where a the plaintiff challenges the constitutionality of a state official's action in enforcing state law. *Green v. Mansour*, 474 U.S. 64, 68 (1985) (*citing Ex parte Young*, 209 U.S. at 155-60). Specifically, the Eleventh Amendment does not prohibit a federal court "from granting prospective injunctive relief to prevent a [state official's] continuing violation of federal law." *Id.* However, a federal court remains without jurisdiction to grant retrospective injunctive relief against a State or state official. *Id.*; *see Stewart*, 131 S. Ct. at 1638 (providing that the *Ex parte Young* doctrine does not apply when a State, and not a state official, is "the real, substantial party in interest").

17

"A federal court possesses broad powers to remedy constitutional violations, but those powers are not boundless." *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991). When no continuing violation of federal can be proven, "injunctive relief is not part of a federal court's remedial powers." *Id.* (*citing Green*, 474 U.S. at 71). Even in cases where the exception to sovereign immunity enunciated in *Ex parte Young* would seem otherwise applicable, a state official may still be able to avail himself of a State's sovereign immunity. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). As pertinent to this case, sovereign immunity will prohibit relief against a state official when he or she is only a nominal defendant and the State is the real, substantial party in interest. *Id.*; *see Hans v. Louisiana*, 134 U.S. 1 (1980) (setting forth the modern doctrine of state sovereign immunity, *i.e.*, that a State cannot be made a party to federal litigation by its own citizens).

For the *Ex parte Young* doctrine to apply, some connection must be established between the alleged unconstitutional conduct and the state official's exercise of his or her official authority. *See Ex parte Young*, 209 U.S. at 157 ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party"). The Seventh Circuit has, on multiple occasions, recognized the essence of the *Ex parte Young* doctrine as follows:

> *Ex parte Young* recognized what has become one of several well-established exceptions to the Eleventh Amendment bar on suing states in federal court, permitting private citizens to sue state officials in their official capacities to require them to comply with federal laws on an ongoing basis. (Citation.) *In such cases, the state official is violating federal law and therefore "the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or government capacity."*

\* \* \*

> In these kinds of cases, "the officer is simply prohibited from doing
> an act which he had no legal right to do."

*McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1049-50 (7th Cir. 2013) (emphasis added)

(*quoting Ex parte Young*, 209 U.S. at 159). In *Ameritech Corp. v. McCann*, the court stated that

"[i]n finding that the Eleventh Amendment did not bar a plaintiffs' suit [in *Ex parte Young*], the

Supreme Court held that when a state official violates the Constitution or federal law, he acts

outside the scope of his authority and is no longer entitled to the State's immunity from suit. 297

F.3d 582, 586 (7th Cir. 2002). *Young* creates a legal fiction where the state official who violates

the Constitutions is "stripped of his official or representative character and is subjected in his

person to the consequences of his individual conduct. *Id.*

      Here, the evidence presented at trial establishes that defendant Lashbrook has not, and is

not, engaging in any specific conduct that impinges upon the plaintiff's medical well-being.

Without any evidence establishing that defendant Lashbrook has engaged in some unconstitutional

act in violation of the Eighth Amendment which would "strip" her of her official capacity and

subject her to the jurisdiction of this Court, *see Ameritech Corp.*, 297 F.3d at 586, the defendants

are entitled to sovereign immunity.

      Defendant Lashbrook recognizes, however, that the Seventh Circuit has held that it may be

appropriate for a complaint based on medical treatment to include a claim for injunctive relief

against a warden who was not alleged to be personally in a claimed violation. *Gonzalez v.

Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Neither that case, nor the authorities on which it relied,

discusses the limitations on the scope of injunctive relief imposed by the Eleventh Amendment to the

Constitution of the United States. *Id.*; *Houston v. Sheahan*, 62 F.3d 902, 903 (7th Cir. 1995); *Ogden v.

United States*, 758 F.2d 1168, 1177 (7th Cir. 1985). The *Houston* and *Ogden* Courts would have had

no occasion to discuss this issue, because neither involved a claim against a State official.

More importantly, *Gonzalez* involved appellate review of an order dismissing a claim for failure to state a cause of action. The Court did not discuss what needed to be proved in order to entitle the plaintiff to injunctive relief at trial. Nowhere does the *Gonzalez* Court hold, or even suggest that, consistent with the limitations of the Eleventh Amendment, the Court may enter injunctive relief against the State of Illinois without proof that any State official has violated the plaintiff's constitutional rights. In fact, the holding of *Ogden*, on which the *Gonzalez* Court relied, was that a federal official could be subjected to injunctive relief, based on the unconstitutional acts of his subordinates.

The defendants do not dispute the proposition that injunctive relief that operates against the State of Illinois may be entered to stop an ongoing violation by a State official. What defendant disputes is the proposition that injunctive relief may be imposed upon the State of Illinois when no State employee or official acted unconstitutionally. In the present case, there is no evidence that any official employed by the Department of Corrections was deliberately indifferent to the plaintiff's serious medical needs.

Furthermore, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645, 122 S. Ct. 1753, 1760, 152 L. Ed. 2d 871 (2002). The Eleventh Amendment and the encompassing doctrine of sovereign immunity prevent federal courts from granting injunctive relief where there is no continuing violation of federal law. *Green v. Mansour*, 474 U.S. 64, 69 (1985); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-03 (1984). A federal court's remedial power is limited by the Eleventh Amendment to prospective injunctive relief. *Edelman*

20

*v. Jordan*, 415 U.S. 651, 677 (1974) (*citing Ex parte Young*, 209 U.S. 123 (1908)). An inmate seeking an injunction must show that there is a contemporary violation that will likely continue in the future.  *Farmer*, 511 U.S. 825, 845-46.

In this case, the plaintiff testified that the size of the cells in N1, along with having a cellmate and enduring a lack of out of cell time, caused injuries, both physical and mental. While incarcerated at Menard, having spent the bulk of his time there since he was first incarcerated in 1991, the plaintiff spent just two brief periods housed in N1; once in 2005 and again in 2014. The plaintiff is not currently housed in N1. There is also no evidence that defendant Lashbrook or any other Menard staff member has any present intention to return the plaintiff to N1. Based on the plaintiff's own testimony, there is no continuing constitutional violation. The plaintiff has not shown that he is now or was ever subjected to a constitutional violation on the claims in this suit.  Accordingly, the plaintiff's requests for injunctive relief are barred by the Eleventh Amendment.

### III.     CONCLUSION

The plaintiff's request is barred by sovereign immunity. Even if the plaintiff met the exception for sovereign immunity, the plaintiff has also failed to meet his burden for injunctive relief in this case. He has provided insufficient evidence to prove that the cells in N1 are objectively insufficient, that his time in N1 actually caused any serious medical condition, or that defendant Lashbrook has culpable mind set to intentionally harm or cause pain to the offenders housed inside N1. Further, the plaintiff has not demonstrated that his request will not harm the public interest. Because the plaintiff has not met his burden, the plaintiff's request for injunctive relief must be denied and judgment entered in favor of defendant Lashbrook.

Respectfully submitted,

JAQUELINE LASHBROOK,

Defendant,

LISA MADIGAN, Attorney General,
State of Illinois,

Darren Price, #6321325                         Attorney for Defendant,
Assistant Attorney General
500 South Second Street              By: s/ Darren Price_____
Springfield, IL  62701                           DARREN PRICE
Phone: (217) 782-1841                         Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| GREGORY J. TURLEY, #N-08083, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-07-SCW |
| | ) | |
| DANNY BEDINGER, et al., | ) | |
| | ) | |
| Defendants, | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 26, 2017, I electronically filed Defendant's Proposed

Findings of Fact and Conclusions of Law with the Clerk of Court using the CM/ECF system

which will send notification of such filing to the following:

None

and I hereby certify that on June 26, 2017, I mailed by United States Postal Service, the

document to the following participant:

Gregory J. Turley, #N-08083
Menard Correctional Center
P.O. Box 1000
Menard, IL 62259

Respectfully Submitted,

s/ Darren Price
Darren Price #6321325
Assistant Attorney General
Office of the Illinois Attorney General
General Law Bureau
500 South Second Street
Springfield, Illinois  62706
Phone: (217) 782-1841
Fax: (217) 524-8767
E-Mail:  dprice@atg.state.il.us
gls@atg.state.il.us