**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| **GREGORY TURLEY, N#-08083,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 3:08-CV-00007-SCW** |
| | ) | |
| **BEDINGER, et. al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1.     Before the Court is Plaintiff's request for injunctive relief relating to the size of the inmate cells in the North Cell House at Menard Correctional Center ("Menard") located in Chester, Illinois, and operated by the Illinois Department of Corrections ("IDOC").  Inmates are housed two to a cell in the North Cell House, a system also known as "double-celling".  Plaintiff alleges that this violates the Eighth Amendment to the United States Constitution in that it is cruel and unusual punishment to house two inmates in the North Cell House cells, under the totality of the circumstances typically present at Menard.

2.     Plaintiff Gregory Turley is incarcerated at Menard.

3.     Jacqueline Lashbrook is the current warden at Menard, and as such, has been substituted as the named defendant in this action [Doc. 336].

4.     This is an action brought pursuant to 28 U.S.C. § 1983.

5.     This Court has jurisdiction under 28 U.S.C. § 1331.

6.     This case was filed in 2008.  Plaintiff's other claims were presented in a jury trial on June 20-21, 2016.  Following the close of Plaintiff's evidence, the Court directed a verdict for defendants on all but the injunction issue, which was set for a subsequent hearing.

7.      The hearing on the injunction was held on April 26, 2017.  The parties appeared through counsel, and evidence was presented through the testimony of multiple witnesses.  This Court also has before it the testimony and evidence presented in the earlier Jury Trial portion of the case.  The following facts were adduced at the trial and the hearing, as well as from other sources.

8.      Illinois prisons are overcrowded.  According to the Illinois State Commission on Criminal Justice and Sentencing Reform, Final Report (December 2016), Illinois prisons were operating at 150 percent of design capacity, and, at the beginning of 2015, housed 48,278 inmates, almost half of whom were sentenced for non-violent offenses. (http://www.icjia.org/cjreform2015/research/illinois-prison-overview.html).

9.      Menard is a maximum-security prison.  The cell houses at issue in this case were originally built in approximately 1878.  (TR 149).  Menard's population is approximately 3,600 prisoners.  (TR 80).  The cells in the North Cell House were originally constructed to house a single inmate only.   (TR 44).  Today, almost every cell in the North Cell House is occupied by two inmates.  (TR 44, 80).

10.      According to Warden Lashbrook, "capacity" at Menard can be increased so long as there "is a mattress, a cot, or a bed" for the prisoners.  (TR 148).  That was the opinion of former Warden Kimberly Butler as well.  (TR 44).

11.      The North Cell House is old, decrepit and antiquated.  (TR 12, 90).  Former Warden Butler admitted that it was definitely not "first rate".  (TR 19).

12.      The cells in the North Cell House measure approximately 4 and ½ feet  x 9 and ½ feet, wall-to-wall.  (TR 84).  More than half of that space is taken up by the bunk beds.  (TR 18).

Then there is the toilet and sink.  (TR 14).  Additionally, each inmate possesses a "box" in which his belongings are kept.  (TR 86).

13.     Other than the toilet or the floor, there is nowhere for the inmate with a lower bunk to sit straight up.  (TR 15, 86).  Asked if he would consider sitting on the floor, inmate James Thrivel stated, "No. No. I mean, they're dirty, they're old concrete floors. There's decades of dirt in the -- you know, as much as you scrub it -- I mean, you would have to scrub it and seal it to keep away from the dirt."  (TR 15).  Moreover, the floor is easily contaminated with urine and excrement. (TR 14).

14.     The "unencumbered space" inside the North Cell House cells is significantly less than the gross square feet, wall-to-wall.  "Unencumbered space" is defined as "usable space that is not encumbered by furnishings or fixtures."  ACA Standards for Adult Correctional Institutions, §4-4131 (4th ed.) ("ACA Standards").  "In determining unencumbered space in the cell or room, the total square footage is obtained and the square footage of fixtures and equipment is subtracted."  (Id. at §4-4132).

15.     According to the ACA Standards, *single cells* "are required for inmates assigned to maximum custody."  (Id. at §4-4131).  Each single cell must have 35 feet of unencumbered space for the single cell occupant.  (Id.)  Even if the North Cell House cells were single occupant cells, the cells would not meet the ACA Standards.

16.     The ACA Standards do provide for double occupancy in cells in medium/minimum security institutions.  (Id. at §4-1132).  In the case of double occupancy, the ACA Standards required 25 square feet of unencumbered space *per occupant.*  (Id.).  The same standard states, "When confinement exceeds ten hours per day, there are at least 80 square feet of total floor space per occupant.  (Id.).  The North Cell House cells fail this test as well.

17.     Former Warden Butler, who is presently the Chief of Program Services, overseeing statewide implementation of programs at IDOC involving education, health care and evidence-based programming, testified at the hearing.  Former Warden Butler testified that there was a time when the entire IDOC subscribed to the ACA Standards, although that is not currently the case.  (TR 64).  She further testified that in her opinion, the ACA Standards were reasonable.  (TR 65).  Former Warden Butler admitted that the North Cell House cells would not meet the ACA Standards.  (Id.).

18.     The Court visited the North Cell House and inspected the cells at issue.  Copies of photographs taken as part of the Court's visit were introduced at Trial as Ex. 49.

19.     The Court finds that the space between the bunk beds and the wall in the cells was barley wide enough for a single large man to stand or pass through.  The height of the top bunk in relation to the bottom bunk makes it impossible for an inmate to sit upright on the bottom bunk.  At best, an inmate on the bottom bunk could lie down propped up against the end of the bottom bunk or sit on the edge of the bottom bunk leaning forward.

20.     The Court also noted, and the photographs demonstrate, that the toilet and sink in each cell is located toward the back of the cell, however, an inmate lying on the bottom bunk would be approximately 24 inches or less from the toilet and the sink.

21.     Former Warden Butler admitted that Menard was designed to hold one offender per cell when designed, and now houses two offenders per cell.  (TR 44).  She made the further admission that, "In my opinion, these cells are too small for two grown men."  (TR 76).

22.     Former Warden Butler further admitted that prison overcrowding factors into the occurrences of assaults on inmates and institutional staff members.  (TR 73).

23.     Testimony at the hearing from the Plaintiff and other inmates was that the heat in the North Cell House during the summer often reached into the high 90's, and sometimes 100 degrees.  (TR 13, 88).  According to Thrivel, "It's incredibly hot.  The walls sweat.  It is oppressively hot."  (TR 13).  He described it as a "a large concrete and steel structure, thick stone walls, and it heats up like a brick oven." (Id.).

24.     Although inmates are permitted to have fans, the witnesses described them as sitting in front of a hair dryer because the fans blew only hot air.  (TR 27, 89).  According to the witnesses at trial, the placement of two men into the small cell exacerbated the heat and humidity in the cells.  (TR 88).  On days when the temperature reached into the 90's, the inmates are given a cup of ice, but according to the witnesses at trial, the ice quickly melts in the sweltering heat. (Id.).

25.     Each of the inmate witnesses, including Plaintiff, testified that it was almost impossible for inmates being housed two-to-a-cell in the North Cell House to exercise in their cells.  First, the limited space between the bunk beds and the wall prevented anything other than restricted movements.  (TR 18-19).  Plaintiff testified that because of his size, it was not possible for him to even perform push-ups in the cell.  (TR 87).  Second, because of the very limited unencumbered space in the cells, one inmate exercising would impose upon the other inmate. (TR 86-87).  Sweat would spray onto the non-exercising inmate, his belongings and bedding. (Id.).  The movement and sounds of exercising would be disruptive to the non-exercising inmate because the inmate exercising would always be right on top of his cellmate.  (Id.).  Consequently, inmates often choose not to exercise in their cells because of the conflict it causes.  (TR 18-19, 87).

26.     An inmate that did choose to exercise in the North Cell House cells would be doing so on a floor that is right next to the toilet and sink.  Urine, feces, and dirty water that did not make it into the sink or toilet would find its way to the cell floor on which the inmate had to exercise.  (TR 14).  Each cell is provided with a coffee cup (4-6 ounces) of diluted cleaning solution once a week to clean their cells.  (TR 14-15, 25, 28).  No rags, mops, brushes or other means of cleaning are provided.  (Id.)  If you happen to be asleep when the bucket comes by, or if you do not have your own cup, the cell gets nothing for the week.  (TR 25).

27.     The inmate witnesses testified that living with another man in such tight quarters caused conflicts between cellmates.  According to Thrivel,

> Imagine you went down to your local skid row, and chose a random homeless person, and you brought them back to your house, and you locked yourself in a broom closet or your bathroom with them, and that's it.

(TR 16).  Plaintiff and Thrivel described fights among cellmates.  (TR 17, 90).  Thrivel testified about being attacked by his cellmate.  (TR 17).

28.     The inmate witnesses testified to the unpleasant smells and sounds inherent in living literally on top of or beneath another person.  The bunk beds are separated by only 24-30 inches.  (TR 15).  Plaintiff testified, "[I]t's like living in a bathroom with someone all day long and never leaving, on most occasions.  So, you know, you are there and you hear and you see and you smell everything."  (TR 89-90).   Thrivel was more descriptive:

> That's about what I would describe it as.  Any kind of animal house in the zoo – the monkey house, lion house.  There is a heavy odor of body odors, flatulence, feet, you know, I mean, everything you could imagine that would be in a – you know, a room full of 200 people that have been there for a long time that only get showers, you know, two or three times a week.

(TR 15-16).

29.     And, the inmates at Menard are often subjected to long periods of "lockdown",
where prisoners are in their cells 24 hours a day, seven days a week, with only a single trip once
a week for a shower.  (See, e.g., TR 34, 48-49, 93, 95).  Lockdowns are ordered when incidents
occur in the prison, such as attacks on guards and fights among inmates.  (TR 147-48).  Some of
the more serious lockdowns have lasted more than two months.  (TR 93).  But they can also
occur for more mundane reasons such as a flu outbreak or rising water levels along the
Mississippi River.  (TR 93-94).  Those lockdowns may last two-to-three weeks.  (Id.).  At the
time of the hearing, Menard had been on lockdown for four consecutive days, with no immediate
plans to come off lockdown following an assault on several correctional officers.  (TR 147).  In
2017, Menard had been on lockdown 10% of the time and that number was rising.  (Id.)

30.     The testimony at trial varied as to how often Menard has been on lockdown over
the years.  All witnesses agreed that the amount of time on lockdown was greater in the past,
sometimes lasting for more than a month.  According to Thrivel:

> In the earlier years, it was a lot more often. It would be 30 days or 60
> days at a time sometimes, depending on what happened. I would say
> there were several years where it was at half of the time -- half of the
> years of the day -- half of the days of the year, so 200 days maybe. That
> wasn't always. It wasn't every year. I would say, on average, you could
> pretty much get 30 to 60 days of lockdown every year. You could
> definitely expect that.

(TR 10).  Thrivel, Earnest Johnson and Plaintiff could all recall several stretches of more than 60
consecutive days on lockdown.  (TR 10, 35, 93).  Johnson testified that he could recall at least
one lockdown of 45 consecutive days since 2016.  (TR 35).

31.     When the prison is not on lockdown, inmates in the North Cell House are
typically in their cells at least 22-23 hours per day.  (TR 9).  Inmates leave their cells to go to
meals twice a day and to shower 2-3 times a week.  (TR 132-33).  Meals last approximately 20

minutes, not including the walk time.  (TR 93).  Lately, however, the inmates have been forced

to eat meals in their cells four days a week.  (TR 24, 26).  Shower time is shorter than meals,

maybe 15 minutes.  (TR 95).  Although out of their cells, this time is considered "restricted time"

because the inmates are not free to move about except as instructed and permitted by the

correctional officers.  (TR 68).

32.     Inmates may also be out of cells if they require medical treatment or participate in

counselling sessions.  (TR 24-25, 112-13).  Inmates are given an opportunity to visit the law

library on a very limited basis.  (TR 23).  But again, this is restricted time, and moreover, these

out-of-cell times are routinely cancelled and not rescheduled.  (TR 23, 26, 39, 69).

33.     Some, but not all, inmates have jobs in Menard.  (TR 35-36).  If an inmate has a

job, he will be out of his cell to perform his job.  (Id.).  Currently, however, inmates in North

Cell House I do not have jobs.  (TR 119).  During the time that Plaintiff was housed in the North

Cell House, he did not have a job.  (TR 93).  If Plaintiff were ever moved back to North Cell

House I, he would lose his current job on the yard gang.  (TR 146).

34.     During weeks when Menard is not on lockdown, inmates are given "yard" or

"gym" time.  Again, the testimony differed somewhat at trial about how much yard and gym

time were offered to inmates in the past.  (TR 92).  Former Warden Butler testified that when she

first started at Menard, "yard time" was 4-5 hours per week, which was typically split into two

days per week.  (TR 67-69).  In 2016, she testified that Menard raised that number to 9 hours in

an effort to have Menard "lead the pack", however, by the time she left Menard the yard time

number was back down to 6 hours per week.  (TR 74).

35.     Warden Lashbrook testified that the current yard and gym schedule for the North

Cell House provides for approximately 6 ½ hours yard and gym time in the North Cell House

uppers (divided between two days), and 9 hours of yard and gym time per week in the North Cell House lowers (divided between three days).  (TR 143).  Warden Lashbrook testified that the inmates in the lowers were scheduled for one extra yard per week because they typically missed one yard period per week because of conflicts.  (TR 143-44). Yard and gym time are cancelled when Menard is on lockdown, and they are not made up if cancelled.  (TR 139).

36.     Plaintiff began to develop both physical and psychological conditions after being housed two-to-a-cell in the North Cell House.  (TR 96).  These included irritable bowel syndrome, tinnitus, arthritis and generalized anxiety disorder.  (TR 97-99).  These conditions worsened throughout his stays in the North Cell House.  (TR 99-100).  Plaintiff sought medical treatment for these conditions and described his belief that the cell sizes and double-occupancy in the cells at the North Cell House were the proximate cause of the conditions.  (TR 101).  This was set forth in Plaintiff's medical records from Menard. (Exs. 36, 37).

37.     Because of his physical and psychological conditions, Plaintiff was twice granted a medical waiver that allowed him to be housed in a single cell.  (TR 54-56, 58-61,102, Exs. 47, 48).

38.     Plaintiff has physical conditions that are hampered by the small cell sizes in the North Cell House.  (TR 86-87).  Plaintiff's arthritis requires that he exercise, however, when restricted to the North Cell House cells, this was not possible.  (Id.).

39.     Plaintiff has filed grievances complaining about, and challenging the practice of, housing two inmates in the North Cell House cells.  (TR 49-50, Exs. 2, 50).  Those grievances were denied by the IDOC.  In denying one of Plaintiff's grievances, the Administration at Menard incorrectly reasoned that the grievance was being denied because the North Cell House

cells met both Illinois State law and the ACA Standards. (TR 104, 107). This was patently false

as admitted by Former Warden Butler. (TR 66-67).

40. Illinois Statute provides:

(730 ILCS 5/3-7-3) (from Ch. 38, par. 1003-7-3)

Sec. 3-7-3. Institutional Safety and Sanitation. (a) Standards of sanitation
and safety for all institutions and facilities shall be established and
enforced by the Department. All buildings and facilities shall be cleaned
regularly and properly maintained. Ventilation of air and heat adequate to
the climate and season shall be provided.
(b) All new, remodeled and newly designated institutions or facilities
shall provide at least 50 square feet of cell, room or dormitory floor space.
(Source: P.A. 83-942.)

41. The Illinois Administrative Code concerning County Jail Standards, provides as

follows relating to cell sizes:

**Section 701.80  Housing**

a) Cell and Detention Room Space
  1) *At least 50 square feet of floor space* shall be provided in each cell, with
  a minimum ceiling height of eight feet.

b) Cell or Detention Room Occupancy.
  All existing cells and detention rooms should be designated for a maximum of
  double occupancy (two detainees per cell or detention room).

****

d) Dormitory Space

  1) A dormitory is defined as a multiple occupancy room that is designed to
  hold more than two detainees who are screened prior to admission for
  suitability to group living.

  2) Floor space for dormitories shall be determined by the number of
  detainees each individual dormitory is designated to house.

    A) *At least 50 square feet of floor space shall be provided per
    occupant*.

Tile 20, Chapter I, subchapter f, part 701, §701.80.

42.     The Illinois Administrative Code concerning Municipal Jail Standards, provides as follows relating to cell sizes:

**Section 720.50  Minimum Cell and Detention Room Standards − Existing Facilities**

\*\*\*\*

b)     The minimum size of each cell shall provide at least ***50 square feet of floor space***. Detention rooms shall provide at least 64 square feet of floor space.

c)     ***All existing cells and detention rooms shall be designated single occupancy***. Multiple occupancy shall not be used until all cells and detention rooms are in use. However, no more than two detainees may be housed in a single cell or detention room.

Tile 20, Chapter I, subchapter g, part 720, §720.50.

43.     The evidence at the hearing demonstrated that the North Cell House has undergone renovations, including installation of smoke partitions, sprinklers, sprinkler pumps and new windows.  (Ex. 51).  A new shower area was also installed.  (Id.).  Over the last 10 years, Menard has also replaced the toilets and installed new bunk beds.  (TR 20).

## CONCLUSIONS OF LAW

**"The degree of civilization in a society can be judged by entering the prisons"** - Fyodor Dostoyevsky, The House of the Dead.

1.     The Eighth Amendment requires a minimum standard for treatment of prisoners including that prisoners are provided with humane conditions of confinement.  Davis v. Baldwin, 2017 WL 951406 at *3 (S.D. Ill. Mar. 3, 2017, Magistrate Williams), citing Farmer v. Brennan, 511 U.S. 825, 832-33 (1994).

2.     Plaintiff alleges that the conditions of the North Cell House cells, measuring just 4 and ½ feet x 9 and ½ feet, wall-to-wall, under the totality of all other conditions of confinement,

violate the Eight Amendment to the U.S. Constitution's prohibition on "cruel and unusual" punishment.

3.      The leading Supreme Court case on cell sizes and conditions of confinement for purposes of the Eighth Amendment's prohibition on cruel and unusual punishment is Rhodes v. Chapman, 452 U.S. 337 (1981).  It is worth revisiting the words of Justice Brennan, who with Justices Blackmun and Stevens, concurred in the judgment but wrote separately.  Justice Brennan stated, "I write separately however, to emphasize that today's decision should in no way be construed as a retreat from careful judicial scrutiny of prison conditions…" Id at 353.  Justice Brennan aptly described the vital and important role of the federal courts in the prison debate:

> Public apathy and the political powerlessness of inmates have contributed to the pervasive neglect of the prisons.
>
> ….
>
> Under these circumstances the courts have emerged as a critical force behind efforts to ameliorate inhumane conditions.  Insulated as they are from political pressures, and charged with the duty of enforcing the Constitution, courts are in the strongest position to insist that unconstitutional conditions be remedied, even at significant financial cost. Justice BLACKMUN, then serving on the Court of Appeals, set the tone in Jackson v. Bishop, 404 F.2d 571, 580 (CA8 1968):  "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations ...."

Id. at 358-59.

4.      "In cases involving the conditions of confinement in a prison, two elements are required to establish a violation of the Eighth Amendment's prohibition against cruel and unusual punishment: first, an objective showing that the conditions are sufficiently serious – i.e., that they deny the inmate "the minimal civilized measure of life's necessities," Rhodes, 452 U.S. at 347, creating an excessive risk to the inmate's health and safety – and second, a subjective showing of

a defendant's culpable state of mind.  Farmer v. Brennan, 511 U.S. 825, (1994); see also Isby v. Brown, 856 F.3d 508, 521 (7th Cir. 2017).

5.     The courts determine whether there have been "serious deprivations of basic human needs by examining the totality of the circumstances.  French v. Owens, 777 F2d 1250, 1252 (7th Cir. 1985).  Courts have considered the "evolving standards of decency that mark the progress of a maturing society." Rhodes, 452 U.S. at 346.  "Thus, conditions that may have been acceptable long ago may be considered unnecessarily cruel in light of our growing understanding of human needs and the changing norms of our society." Delaney v. DeTella, 256 F.3d 679, 683 (7th Cir. 2001).

6.     To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health.  Rhodes, 452 U.S. at 347.  Thus, prison officials violate the Constitution when they deprive an inmate of his "basic human needs" such as food, clothing, medical care, and safe and sanitary living conditions.  Id. (citation and internal quotation marks omitted).  Moreover, conditions of confinement may be aggregated to rise to the level of a constitutional violation, but "only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." Wilson v. Seiter, 501 U.S. 294, 304 (1991) (noting that "low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation).

7.     To meet the subjective element, the plaintiff must show that the defendant acted with "more than mere negligence." Farmer, 511 U.S. at 835.  "The subjective component relates to the defendant's state of mind and requires a showing of deliberate indifference." Delaney, 256 F.3d at 683.  According to the court in Delaney, "At a minimum in a case like this, an inmate

must allege "actual knowledge of impending harm easily preventable." Id. (quotation and citation omitted). "A failure of prison officials to act in such circumstances suggests that the officials actually want the prisoner to suffer the harm." Id. (quotation omitted).

8.    The Court concludes that confining Plaintiff, now or in the future, in a North Cell House cell, a cell of less than 50 square feet with much less usable area than even that, with one or more inmates, constitutes a serious deprivation of his basic human needs, and as such, creates an excessive risk to Plaintiff's health and safety. The Court finds persuasive the testimony of former Menard Warden Butler, when she stated, "In my opinion, these cells are too small for two grown men." The Court further finds that defendant has acted with deliberate indifference toward Plaintiff's claims because there was actual knowledge of impending harm to Plaintiff that could and can be prevent by prohibiting double celling in the North Cell House.

**The Objective Element**

9.    The Court recognizes that double-celling of inmates is not *per se* unconstitutional. Rhodes, 452 U.S. at 337 (finding that double-celling in 63 square feet not un-Constitutional *per se*). But, no court has found that maintaining inmates inside a maximum-security prison cell consisting of approximately 10 square feet of unencumbered space per person meets the Constitutional requirements imposed by the Eighth Amendment. In short, it simply does not meet the "evolving standards of decency that mark the progress of a maturing society."[1]

---

[1]    The Court notes society's standards worldwide are quite different from those at Menard. See, e.g., First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held at Geneva in 1955, and approved by the Economic and Social Council by its resolutions 663 C (XXIV) of 31 July 1957 and 2076 (LXII) of 13 May 1977, which states:

> Accommodation 9. (1) Where sleeping accommodation is in individual cells or rooms, each prisoner shall occupy by night a cell or room by himself. If for special reasons, such as temporary overcrowding, it becomes necessary for the central prison administration to make an exception to this rule, it is not desirable to have two prisoners in a cell or room.

10.     The Court could find that the cells in the North Cell House are per se unconstitutional because they do not meet the statutory requirements under Illinois law. (730 ILCS 5/3-7-3).  Under Illinois law, "All new, remodeled and newly designated institutions or facilities shall provide at least 50 square feet of cell, room or dormitory floor space."  (Id.). While certainly not new, the cells in the North Cell House have been remodeled, including installation of smoke partitions, sprinklers, sprinkler pumps and new windows (Ex. 51), a new shower area was also installed (id.), and Menard has also replaced the toilets and installed new bunk beds.  (TR 20).  Therefore, the statute should be applied.

11.     The defendant will argue that even if the statute does apply, the cells in the North Cell House substantially meet the statute; however, this is a misreading of the statute.  The 50-square foot requirement is for "floor space", which should be equated to the definition of "unencumbered space" in the ACA Standards.  The North Cell House cells have less than 20 square feet of unencumbered space.  Under the statute, 20 square feet of floor space would not meet the statutory requirements.

12.     In the alternative, even if the Court assumes that the definition of "floor space' in the statute refers to gross floor space, the statute should be interpreted to refer to 50 square feet *per person.*  The State of Illinois has imposed a 50-square foot per person standard on its county facilities and municipal jails.  County dormitories must have 50 square feet of floor space per

See also, Canadian Standard Minimum Rules for the Treatment of Prisoners, (double-celling only 15% of its prisoners, and requiring 82 square feet of cell space when it does so). http://www.cbc.ca/news/canada/canadian-prison-cells-by-the-numbers-1.1275901.

See also, Susanna Y. Chung, *Prison Overcrowding: Standards in Determining Eighth Amendment Violations*, 68 Fordham L. Rev. 2351 (2000), available at: http://ir.lawnet.fordham.edu/flr/vol68/iss6/9

person (Title 20, Chapter I, subchapter f, part 701, §701.80), and municipal jails must have 50 square feet of floor space and must be designated for *single occupancy*. (Title 20, Chapter I, subchapter g, part 720, §720.50).  The State of Illinois should not be permitted to impose a more lenient standard on its own prison cells than it does on the cells of its counties and municipalities.

13.    But this Court need not – although it could – make a finding that maintaining inmates inside a maximum-security prison cell consisting of less than 10 square feet of unencumbered space per person is a *per se* violation of the Eighth Amendment, because the cell size, ***in conjunction with the totality of the circumstances***, has created a situation that is unconstitutional.  In this Seventh Circuit, the court has found that double-celling of inmates violative of the Eighth Amendment.  In <u>French v. Owens</u>, 777 F.2d 1250, 1253 (7th Cir. 1985), a case very similar to the facts at hand, the Seventh Circuit affirmed the district court's ban on double-celling "where there was narrowly cramped double celling, unsafe and unsanitary conditions."  The court noted the findings of the district court regarding the cells and conditions:

> Built in 1923, by 1982 the Pendleton reformatory housed almost 2,000 prisoners, over twice its intended capacity.  To accommodate the rise in population, prison officials placed two prisoners in cells that were intended for one.  More than one-third of all cells were converted to double cells. After reviewing the record and personally visiting the prison site, Judge Dillin concluded that "rampant" double celling, in conjunction with general conditions of overcrowding, violated the eighth and fourteenth amendments.
>
> By 1982, the gross available space per man in the double cells was 24 square feet, the net amount approximately half that.  In the Administrative Segregation Unit-where prisoners are kept who need to be separated from the general inmate population-the ceilings are lower and inmates on the top bunks of double cells are unable to sit up.  There is no space for a chair on the floor.  As a result, some have developed back problems.
>
> The district court found that the forty per cent of prisoners in double cells spend large amounts of time together, up to 20 to 23 hours per day for the several hundred prisoners in protective custody or without work assignments.

> Deplorable conditions exist beyond the double-celling problem. All cells and dormitories are inadequately ventilated. There is no means of distributing heat to the cells and, in summertime, no system for circulating air to the cells. Rooms are dirty and odorous. Toilets and lavatories are "virtually uncleanable." Lighting is poor. Cells have no hot water.
>
> Especially in light of the poor supervision, safety, medical care and food preparation at the facility, Judge Dillin found the conditions intolerable. He ordered that the population be reduced to 1,615 and enjoined double celling.

Id. at 1252.

14.     The conditions in the North Cell House cells are equally deplorable, and in some cases, arguably worse. The cell space per person was similar – approximately 20 square feet, with half that amount being usable space. The bunks are such that the man on the bottom cannot sit upright and there are no chairs on which to sit. The cells are dirty and odorous; cleaning supplies are wholly-inadequate if given out at all. The temperatures in the North Cell House reach the 100-degree mark in the summer, and ventilation is ineffectual, unless a fan is purchased by the prisoner, and then it is like having a hair dryer blow hot air into the room. But the most egregious fact here, that was not present in Owens, is that prisoners at Menard are often on 24-hour per day lockdown for long periods of time. In the past, prisoners at Menard have been locked in their double-occupant cells for 24 hours a day for more than two months at a time. (TR 10, 35, 93).

15.     Moreover, the court made its determination in Owens before Delaney, where the court recognized that, "Given current norms, exercise is no longer considered an optional form of recreation, but is instead a necessary requirement for physical and mental well-being. Delaney, 256 F.3d 679 (examining deprivation of exercise only as an Eighth Amendment violation). The testimony at the hearing here made it clear that there are no viable means of exercising in the

North Cell House cells when being housed with another inmate.  In a "perfect week", the inmates might be allowed 6 hours of yard time, but there is almost never a "perfect week."  (TR 38).  Instead, with lockdowns and cancelled yard times, inmates spend almost all of their time inside their cells, where exercise is not possible.  It is the combination of all the conditions, including the lack of exercise, that contribute to the unacceptable conditions in the North Cell House.

16.     In Lock v. Jenkins, 641 F.2d 488 (7th Cir. 1981), which was not an Eighth Amendment case because it involved pre-trial detainees, but which the Seventh Circuit analyzed like an Eighth Amendment case under the same standard, the court noted, "It seems to us that a minimum requirement as to cell area should be imposed and this minimum should be determined flexibly in relation to the amount of time individuals are to be kept in the cell." Id. at 494.  The court reversed the district court, and held that keeping the pre-trial detainees in *single cells* that were 4 feet by 8 feet, for up to 22 hours per day with *daily out-of-cell* exercise, was unconstitutional. Id. at 492-93.  The court concluded, "Except where individual circumstances show the need for more restrictive confinement, [the inmates] should be allowed to spend *significant* periods of each day out of their cells and some activities or programs should be regularly available to them in their time out of cells." Id. at 495 (emphasis added).

17.     Inmates at Menard in the North Cell House cells are double-celled, spend up to 24 hours a day in their cells, and have out-of-cell exercise twice a week at best.  These conditions are far more restrictive and onerous than for the pre-trial detainees in Lock.

18.     Courts from other jurisdictions have made similar findings.  In Tillery v. Owens, 907 F.2d 418, 427-28 (3rd Cir. 1990), the court held that double-celling in 57 square foot cells, when the inmates spent up to 14 hours a day in their cells, and looking at the totality of the

circumstances, was unconstitutional.  The court affirmed the district court's findings as

supporting immediate correction of the unconstitutional condition of double-celling inmates:

> In this case, the district court did not look merely at the space allotted each double-celled inmate, however inadequate that may be, but looked instead at the totality of conditions in the institution.  In its opinion the court determined that the institution was unconstitutionally overcrowded, that lighting, ventilation, plumbing, showers and fire safety provisions fell below constitutional norms, that violence and insecurity were pervasive, and that medical and mental health care were constitutionally deficient. It also found that inmates had limited opportunities for recreation outside their cells, that they were double-celled for long periods of time, and that the inadequate screening before double-celling of inmates resulted in "fatal pairings," in which "violent, delusional and predatory inmates are often paired" with inmates who are unable to protect themselves.  In these circumstances, the district court was amply justified in holding that double-celling violated the Eighth Amendment prohibition against cruel and unusual punishment.

Id. (citations omitted).  See Lareau v. Manson, 651 F.2d 96, 107-08 (1981) ("With respect to the

specific practices of confining inmates in the fishtank, forcing men to sleep on mattresses on the

floors and placing healthy or nondisruptive inmates in the medical or isolation cells (sometimes

double-bunked with ill cellmates and confined for 23 hours a day), we have no trouble upholding

the district court's conclusion that these measures do not provide minimum decent housing under

any circumstances for any period of time. Perhaps in the event of a genuine emergency situation,

like a fire or riot, such recourse could be temporarily excused, see Powell v. Ward, 542 F.2d 101

(2d Cir. 1976), but as regular methods of housing convicted inmates, none of these practices can

pass constitutional muster."); and Ramos v. Lamm, 639 F.2d 559, 570 (10th Cir. 1980)

(Unquestionably, the small cells in which inmates are confined, along with the deteriorating and

unsanitary conditions in the main living areas, have a direct detrimental impact on the health and

well-being of the inmates. Considering the record as a whole we must sustain the trial court's

findings and conclusion that the conditions in which inmates are confined at Old Max are 'grossly inadequate and constitutionally impermissible.'").

19.     Because this Court has before it the issue of whether the Defendant should be enjoined from double-celling Plaintiff, now or in the future, in the North Cell House, the actual physical and mental impact that double-celling has inflicted upon Plaintiff is relevant.  See, e.g., Isby v. Brown, 856 F.3d 508 522-23 (7th Cir. 2017) (plaintiff's complaints about the conditions of his confinement fell short).  Plaintiff began to develop both physical and psychological conditions after being double-celled in the North Cell House.  (TR 96).  These included irritable bowel syndrome, tinnitus, arthritis and generalized anxiety disorder.  (TR 97-99).  These conditions worsened throughout his stays in the North Cell House.  (TR 99-100).  Plaintiff sought medical treatment for these conditions and described his belief that the cell sizes and double-occupancy in the cells at the North Cell House were the proximate cause of the conditions.  (TR 101).  Because of his physical and psychological conditions, Plaintiff was twice granted a medical waiver that allowed him to be housed in a single cell.  (TR 54-56, 58-61,102, Exs. 47, 48).  Moreover, Plaintiff's physical conditions are hampered by the small cell sizes in the North Cell House.  (TR 86-87).  Plaintiff's arthritis requires that he exercise, however, when restricted to the North Cell House cells, this is not possible.  (Id.).

20.     The Court finds that Plaintiff has presented evidence that meets the objective element in that the cells in the North Cell House are too small to house two inmates, the inmates spend too little time outside of their cells, and under a totality of the circumstances analysis, the practice of double-celling in the North Cell House poses an unreasonable risk of serious damage to Plaintiff's health.  Rhodes, 452 U.S. at 347.

**The Subjective Element**

21.     If the inmate successfully establishes that the conditions were sufficiently serious, the court then examines whether prison officials acted with "deliberate indifference" to the conditions in question.  Townsend v. Fuchs, 522 F.3d 765, 773 (7th Cir. 2008), citing Seiter, 501 U.S. at  302.  "Deliberate indifference," in turn, means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it.  Id. citing Farmer, 511 U.S. at 847.  It is not enough for the inmate to show that the official acted negligently or that he or she should have known about the risk, rather, "the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference."  Id.

22.     Plaintiff has met this burden.  The fact that Menard is overcrowded, that its cells in the North Cell House present a health and safety risk, that the inmates are not permitted to leave their cells for a significant period of time each day, has been the subject of numerous grievances by inmates.  Inmate Thrivel testified that he had filed grievances about the cell sizes. (TR 29).  Plaintiff filed grievances about the cells sizes.  (TR. 103, Exs. 2, 50).  Former Warden Butler admitted that other grievances besides Plaintiff's had been filed.  (TR 62-63).  All grievances were denied.  As a trier of fact, the Court "may conclude that a prison official knew of a substantial risk from the very fact that it was obvious."  Farmer, 511 U.S. at 842.  The overcrowding at Menard, and the complaints about the conditions of confinement in the North Cell House, are obvious and known to everyone at Menard.

23.     It is disturbing to the Court that in Plaintiff's case, the explanation for the rejection of his grievance was patently false.  On Exhibit 50, Plaintiff's grievance was denied,

according to Menard's reasoning, because the cells met both state law (50 square feet of space) and the ACA Standards (35 square feet per person). Neither is correct. That Menard would utilize obviously false reasons for denying a grievance shows deliberate indifference to Plaintiff's needs. See Dixon v. Godinez, 114 F.3d 640, 645 (7th Cir. 1997) (sarcastic response to inmate's claim regarding bitter cold in cell raised issue of deliberate indifference).

24.    Moreover, Plaintiff has sought medical attention for his conditions associated with the confinement in the North Cell House. And although on occasion Plaintiff was granted temporary reprieves from double-celling in the North Cell House for medical reasons, he was eventually returned to a double cell. (TR 111-12). The reality is that "while double-celling may not always cause unconstitutional levels of violence, filth or fire hazard, double-celling in an institution plagued with such problems may be so unbearable as to "'deprive inmates of the minimal civilized measure of life's necessities.'" Tillery, 907 F.2d at 428 quoting Rhodes, 452 U.S. at 347.

25.    Plaintiff has repeatedly complained about the conditions of confinement in the North Cell House by filing grievances and a lawsuit, and he repeatedly requested medical attention; yet, the wardens and others in charge at Menard have done nothing to rectify the situation. This inaction satisfies the subjective element of an Eighth Amendment claim. Delaney, 256 F.3d at 686; Dixon, 114 F.3d at 645 (failure to file grievance was not fatal to Eighth Amendment claim and subjective element where, "The record indicates that Dixon's was not the only lawsuit filed concerning extreme cold at Stateville. Indeed, this is not the first time the problems concerning an inadequate heating system at Stateville have found their way before this court – …").

26.     Here, other inmates have filed lawsuits alleging Menard's practice of double-celling violates their Constitutional rights.  See Randle v. Butler, 2017 WL 1035752 (S.D. Ill Mar. 3, 2017); Meskauskas v. Buskohl, 2015 WL 2407577 (S.D.Ill. May 19, 2015); Munson v. Hullick, 2014 WL5151290 (S.D.Ill. Oct. 10, 2014); Willis v. Hullick, 2010 WL358836 (S.D.Ill. Jan. 25, 2010).

27.     Under these factual circumstances, Menard prison officials have acted with "deliberate indifference" to the conditions in question – the conditions of confinement in the North Cell House cells, including the double-celling of inmates.  Townsend, 522 F.3d at 773.

**The Remedy**

28.     Having determined that Plaintiff's constitutional rights under the Eighth Amendment's prohibition against cruel and unusual punishment have been violated, the Court must now turn to the appropriate remedy.  "The district court has broad powers to forge an adequate remedy to permanently correct any constitutional violation."  Owens, 777 F.2d at 1252 (affirming district court ban on double-celling).

29.  In Tillery, the court outlined the principles that guide district courts:

> The Supreme Court has enunciated several principles to guide the district courts in exercising their equitable powers which, although they stem primarily from school desegregation cases, are equally applicable in the prison context.  First, the nature of the remedy is to be determined by the nature and scope of the constitutional violation and thus must be related to the *condition* alleged to offend the Constitution. Second, the decree must be limited to remedial purposes.  Finally, the remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.  Within these guidelines, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

907 F.2d at 429 (citations and quotations omitted).

30.     The issue before this Court is discrete as to the Plaintiff's rights.  Plaintiff did not allege a class action lawsuit.  Therefore, this Court finds that because Plaintiff Gregory Turley has demonstrated that defendant violated his Eighth Amendment right against cruel and unusual punishment, this Court Orders that Plaintiff shall not be double-celled an any cell within the North Cell House at Menard Correctional Center without further order of this Court.  This remedy is narrowly tailored to address the constitutional violations alleged by Plaintiff.

**WITZEL, KANZLER & DIMMITT, LLC**

By:   /s/ Jay L. Kanzler
Jay L. Kanzler #6208895
2001 S. Big Bend Blvd.
St. Louis, Missouri 63117
Tel:   (314) 645-5367
Fax:  (314) 645-5387
jaykanzler@wkllc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of June 2017, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and sent to all parties of record

<u>          /s/   Jay L. Kanzler          </u>