## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
## EAST ST. LOUIS DIVISION

GREGORY J. TURLEY, #N-08083,    )
                                     )

    Plaintiff,               )
                                     )

    v.                      )     No. 08-07-SCW
                                     )

JAQUELINE LASHBROOK , et al.,   )
                                     )

    Defendant.             )

## <u>ORDER AND INJUNCTION</u>

This matter is before the Court on Plaintiff's request for a permanent injunction. The Plaintiff, Gregory Turley, filed this action under 42 U.S.C. § 1983 for alleged violations of his constitutional rights while a prisoner at Menard Correctional Center. Mr. Turley alleges he was housed from September 2005 to April 2006 in the North I (uppers) cell house at Menard Correctional Center in a cell that was forty square feet in size.  He was again housed in North I (lowers) from November of 2014 until May of 2016 in the same size cell. He claims that housing him in the North I cell house with a cellmate constituted deliberate indifference to his health and well-being as a result of the cells being cramped and too small for two adult inmates.

Mr. Turley's original claims concerning the size of his cell were dismissed from this case at threshold review.  His other claims proceeded to trial.  After appeal, the Seventh Circuit reversed the dismissal of his cell size claims and those claims proceeded to trial before this Court.  After the close of Plaintiff's evidence, the Court dismissed Plaintiff's individual capacity claims against Defendants Kim Butler, Charles McDaniel, Dan Ohlau, Anthony Ramos, Betsy Spiller, Alan Uchtman, and Roger Waller.  Thus, all

that remains is Plaintiff's Claim for injunctive relief against the current Warden of Menard Correctional Center, Jaqueline Lashbrook.  Mr. Turley seeks injunctive relief in the form of an order from this Court precluding the Warden of Menard from housing him in the North I cell house in a cell with another inmate. This claim was heard before the Court during a jury trial on June 20 and 21, 2016, and at a bench trial solely on the issue of injunctive relief on April 26, 2017.   Additionally, the Court visited Menard Correctional Center and viewed the cell Mr. Turley occupied in the North I cell house on November 22, 2016.    The parties have provided post trial briefing to the Court, proposed findings of fact and conclusions of law, and responses thereto.  Finally, after the case was fully submitted to the Court, Mr. Turley was transferred from Menard Correctional Center to Hill Correctional Center.  This prompted the Court to request supplemental briefing on the issue of the availability of injunctive relief against the Warden of Menard in light of Mr. Turley's transfer.

## LEGAL STANDARDS

### Conditions of Confinement

Mr. Turley's claims for injunctive relief are brought pursuant to the Eighth and Fourteenth Amendments.  In the context of claims relating to conditions of confinement, the Eighth Amendment requires that prisoners must be afforded the "minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981); *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Inmates must be provided with "adequate food,

clothing, shelter, and medical care, and prison officials must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 - 33 (citations omitted). In order to succeed on a claim for inhumane conditions of confinement, an inmate must establish: (1) that he was housed under conditions that were "'sufficiently serious' so that 'a [jail] official's act or omission results in the denial of the minimal civilized measure of life's necessities'", and (2) the defendant was deliberately indifferent to that risk. *Farmer,* 511 U.S. at 834 – 837; *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008); *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008).   In order to prove deliberate indifference, the plaintiff must show that the officials actually knew of the condition but refused to take reasonable steps to resolve it.   *Townsend*, 522 F.3d at 773; *Grieveson*, 538 F.3d 775.   More specifically, the prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   *Farmer,* 511 U.S. at 837.   A factfinder may conclude, however, "that a prison official knew of a substantial risk from the very fact that a risk was obvious."   *Framer,* 511 U.S. at 842.

**Injunctions and the Prison Litigation Reform Act**

Injunctions are extraordinary equitable remedies that are to be granted in civil cases only when specific criteria are clearly met by the movant. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).   For a permanent injunction to issue, the plaintiff must show: (1) success, as opposed to likelihood of success on the merits; (2) irreparable harm; (3) the benefits of granting the injunction outweigh the harm to the defendant; and (4) the

3

injunction is in the public interest. *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.,* 672 F.3d 492,498 (7th Cir. 2012). Permanent injunctive relief is also only available where there is an ongoing or threatened violation of federal law. *Farmer,* 511 U.S. at 845 – 46 & n.9; *Vickery v. Jones,* 100 F.3d 1334, 1346 (7th Cir. 1996).

In the context of prisoner litigation, there are further restrictions on courts' remedial power. The scope of the court's authority to enter an injunction in the corrections context is circumscribed by the Prison Litigation Reform Act (PLRA). *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Under the PLRA, prospective injunctive relief "shall extend no further than necessary to correct the violation." 18 U.S.C. §3626(a)(1)(A). Further, a Court may not grant injunctive relief unless it finds the "relief is narrowly drawn, extends no further than necessary to correct the violation," and is "the least intrusive means to do so." 18 U.S.C. §3626(a)(1) (A); *See also Westefer*, 682 F.3d at 683 (the PLRA "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: prison officials have broad administrative and discretionary authority over the institutions they manage") (internal quotation marks and citation omitted).

Thus, Mr. Turley must first prove that double celling in North I objectively fails to provide this minimum need for space, given all the other circumstances of his confinement. In addition, in order to prevail, Turley must also prove that Warden Lashbrook knows of, and disregards an excessive, or substantial risk of serious harm caused by the practice of double celling in the North I cell house. *Farmer,* 511 U.S. 837.

4

Mr. Turley need not establish that "a prison official acted or failed to act believing that harm actually would befall and inmate; it is enough the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

## FINDINGS OF FACT

From September of 2005 until April of 2006 and from November of 2014 until May of 2016, Mr. Turley was confined in the North I cell house of Menard. At all times during these periods Turley was double celled; that is, he occupied his cell with another inmate, or cellmate. The cells in the North I cell house are clean and sanitary.[1] There is no evidence in the record that the inmates in North I as a whole receive inadequate food or medical care. However, the cells in the North I cell house are shockingly small. They measure 4' 8" wide by 10' 8" long.[2] This provides total floor space of 49.68 square feet. The cells are walled on three sides and barred on the side of the cell entry. They were originally designed to house a single inmate. The cells are equipped with a bunk bed 6'2" long by 31" wide and a toilet, sink, and TV stand on the far end of the cell. The height of the top bunk in relation to the bottom bunk makes it impossible for an average sized male to sit upright on the bottom bunk. The inmates store their property boxes underneath the bed. The end of the bunk bed extends to a distance of 20" from the

---

[1] Although there was testimony that some of the cells were unsanitary due to insufficient cleaning supplies, the Court did not observe such conditions during its visit and concludes that the evidence suggests that, to the extent such unsanitary conditions exist in North I cells, they are isolated.

[2] These measurements differ from the dimensions claimed by Mr. Turley. However, they are consistent with the unobjected to testimony of Ms. Lashbrook, who explained how she obtained the measurements. The Court adopts the measurements testified to by Ms. Lashbrook as the Court finds them more reliable. The Court does not conclude that Mr. Turley was attempting to mislead the Court. Rather, it appears that his estimates are simply inaccurate.

front of the cell/bars.  This leaves an "L" shaped strip of unencumbered space that is 25" wide by 6' 2" long between the bed and the left side of the cell as well as a space of 20" by 4' 8" at the front of the cell between the bed and the bars that spans the entire width of the cell. That's a total of 20.3 square feet of unencumbered space.

Yet, to say that this space is unencumbered is not to say that it is usable in any meaningful sense.  The strip of floor along the side of the wall provides enough room to get out of the bed to access the toilet, sink, and TV stand at the end of the cell.  It's a tight corridor to say the least.  When the Court visited Mr. Turley's former cell, while walking along this narrow strip, it was impossible to do so without rubbing arms and shoulders against the bed and wall. (Pltf. Exs. 10c & 49) While the space is technically large enough to perform some exercise such as jumping jacks or knee bends, the presence of a cellmate in close proximity makes any vigorous exercise impossible. There is barely enough room to stretch.  The only real activity that can be performed in this space is standing.  In fact, in a cell adjacent to Mr. Turley's which was occupied by two inmates at the time of the site visit, the inmates were doing just that.  They were standing next to each other with their arms resting on the top bunk writing what appeared to be letters.  So it cannot be said that the narrow space between the bed and the wall is not usable.  It is.  With the cooperation of both inmates it can, along with the top bunk, essentially be used as a standing desk.  Similarly, the small space at the end of the cell can be used to stand or sit- but not much else.

Of course the inmates living in North I are not confined to their cells 24 hours a day (except during lockdowns).  Most weeks, the inmates receive two yard periods of three to three and a half hours out of their cells.[3]  Yard is outdoors and allows for exercise and fresh air. Inmates also normally receive a two hour period of gym time per week that provides additional opportunity for exercise.  Finally, inmates leave their cells for two meals per day.  Each mealtime is scheduled for 35 minutes which includes the time travelling to the chow hall.[4]  Inmates are also allowed one shower per week which lasts 15 minutes.

There are additional opportunities for an inmate to get out of his cell, but these may not apply to all inmates.  Inmates can go to the chapel for religious services one hour per week.  Also, an inmate may have a job or a Court deadline that allows for a visit to the law library.

All told, for an average inmate without a job who goes to church, he will have 9 hours and 45 minutes out of his cell per week for activities and an additional 8 hours and 10 minutes eating and going to and from chow.  On a good day he will be out of his cell for 4 ½ hours.  On a bad day- one hour.  During lockdowns, he won't leave his cell at all.  In fact, during those periods, the inmates are confined to their cells 24 hours a day with the exception of one shower per week.  In the past, the frequency and extent of

---

[3] The inmates in North Uppers receive two yard periods per week.  Three are scheduled for North Lowers so that inmate workers that are housed there (none are housed in Uppers) can receive at least two yard periods when they are not working.

[4] Mr. Turley testified that chow lasts 20 minutes, though it is not clear that this estimate is 100 % accurate.  In any event the Court has no trouble concluding that the amount of actual time out of the cell and eating varies.  It is also clear that meals are rushed.

the lockdowns was much worse.  Mr. Turley testified that they could last 30 to 60 days. But all sides agree that the situation has improved in recent years.  As of April of 2017, Menard had been on lockdown approximately 8 days in the three months Ms. Lashbrook had been warden.

Despite the periodic time out of the cells, even in ideal periods without lockdowns, living in the conditions accompanying double celling in the North I cells is difficult in the extreme.  While being a prisoner at Menard would be difficult regardless of the cell, the cramped conditions in the North I cells cause inmates to experience feelings of claustrophobia and exacerbate any existing stress that no doubt accompanies any incarceration.   In the summertime, the cells are unbearably hot due to high temperatures and humidity in Southern Illinois and the poor ventilation and lack of air conditioning in the cells. At such times the stench from human body odors can be overwhelming.  Mr. Turley described it as akin to living in a bathroom. Another inmate testified it was similar to the odor of an indoor enclosure at a zoo.

In addition to the privations of having to simply exist in such close quarters with another adult human, the Court also recognizes, as reflected in the testimony, that such conditions contribute to an already volatile environment at Menard.   Any two emotionally healthy adult men would find it extremely difficult to get along in such conditions for extended periods of time.   Naturally, at Menard, with a population of violent felons, impulse control is a commodity in short supply.   Inmate on inmate assaults and staff assaults are all too common (often resulting in other cases before this

8

Court).   The former Warden of Menard, Kim Butler, opined at trial that overcrowding factors into inmate on inmate and staff assaults.  She also testified that the North I cells, in her opinion, are not large enough for two grown men.  While the Court agrees with Ms. Butler, her characterization is properly described as an understatement.

The size of the cells in North I, combined with the amount of time the inmates are confined to those cells, is so clearly inadequate that this should be obvious to even the most casual observer. The Court concludes that these conditions put inmates at serious increased risk of mental and emotional stress as well as contribute to the obvious negative health impacts of a forced sedentary lifestyle.  Additionally, the close conditions over extended periods present a serious increased risk of inmate on inmate (and staff) assaults and violence.

## CONCLUSIONS OF LAW

The Cells in the North I cell house are too small to house two grown men for any extended period of time. The Court finds that the practice of double celling inmates in North I over an extended period, even when taking into account ideal conditions wherein the inmates receive all scheduled recreation, programming, and meals outside of the cell,  provides those inmates inadequate living space to meet the  "minimal civilized measure of life's necessities."   These conditions are so extreme that they also cause an excessive risk to inmates' mental and physical health.

The Court recognizes that the issue of cell size has been addressed by both the Supreme Court and this Circuit.  For example, in *Rhodes,* the Supreme Court found that the practice of double celling in cells that were 63 square feet was constitutional. 452 U.S. at 341 & 347 - 352**.**   Aside from the fact that the cells in *Rhodes* were approximately 30% larger than those in North I, of critical importance to this Court's consideration is the fact that the cells in *Rhodes* were connected to a dayroom where the inmates were allowed to frequent between 6:30 a.m. and 9:30 p.m. every day.  This compared to the typical day in North I where the inmates will only leave their cells twice in order to go to meals.

A much closer case is *Smith v. Fairman* 690 F.2d 122 (7th Cir. 1982).  In *Fairman* the Seventh Circuit considered, among other things, whether double celling at Pontiac correctional center in cells measuring 55.3 square feet was constitutional. 690 F.2d at 124 -126.   Moreover, the conditions described in *Fairman* appear to more closely approximate those experienced by the inmates in North I.  The cells are cramped, are often permeated with foul odors, and the inmates may spend as much as 20, or 23, hours in their cell in a given day depending on whether they were in segregation.  690 F.2d at 124.  Thus, on its face, there does not appear to be much difference between the conditions found constitutional in *Smith* and those presented in North I at Menard.

Here, however, the Court identifies two significant considerations that lead it to conclude that *Smith* should not govern this case.  First, there is the matter of 5.6 square feet.  That's how much bigger the cells were in Pontiac than those in North I.  It doesn't

sound like a lot. But when we are talking about an "L" shaped strip of "usable" space that's only 20.3 square feet total, an additional 5.6 square feet would be substantial. This begs the question; if a 55 square foot cell is sufficient to house two men under our contemporary standards of decency, then how small would the cell need to be before it could be judged intolerable under the Eighth Amendment?  Surely there is a point at which one can conclude that a box is just too small for two grown men to live in.

Take as an example a hypothetical cell that is eight and a half feet long and two and one half feet wide that contained a bunk bed, toilet, and sink. The bunks would take up the entire width of the cell and abut the bars on one end of the cell and the sink and toilet on the other. In order to use the toilet or sink an inmate would need to crawl out one end of the bed.  Similarly, crawling out the other end would be the only way to exit the cell.  Such a situation would plainly violate any contemporary standards of decency and would, without question, put inmates at risk of serious mental and physical harm.

The conditions in North I are barely one step removed from those imagined in the Court's hypothetical.  The additional space provided by the narrow corridor between the bed and the cell wall provides an exit route from the cell and a means of accessing the toilet, sink, and any property stored under the bed.  The only real activities that can be accomplished in this space are standing and, with the cooperation of both inmates, using the top bunk as a desk.

Do these additional conveniences, beyond what would be available in the two man box, in combination with the out of cell time available to inmates in North I, provide those inmates with the minimum civilized measure of life's necessities ? They do not. Having stood inside one of these cells the Court, in considering all of the evidence, draws what seems to be the only logical and obvious, conclusion – the conditions are inhumane. Furthermore, while the Court does not have sufficient evidence to conclude that any of Mr. Turley's various physical ailments were caused by his time double celled in North I, the Court easily concludes that the cell size likely exacerbated his arthritis and Irritable bowel syndrome and further caused him considerable emotional distress beyond what can be expected, and accepted, in a prison setting.

The Court also considers whether the evolving standards of decency have either changed, or have simply been better articulated, since the Seventh Circuit's decision in *Fairman*. *See Farmer,* 511 U.S. at 833; *Rhodes,* 452 U.S. at 347. As the *Fairman* court acknowledged, determining what constitutes evolving standards of decency, while open ended, does not allow judges to substitute their subjective views for those of society. *Fairman,* 690 F.2d at 125. Rather, "we must form our judgments on the basis of 'objective factors to the maximum possible extent.'" *Id.* (quoting *Rhodes,* 452 U.S. at 346).

In *Fairman,* there were testifying experts that concluded the cell size was too small. In this case, former Warden Butler testified that the cells are too small for two grown men. On the other hand, the current warden, Defendant Lashbrook, disagreed

on this point.  In addition, the Court accepted evidence of the standards promulgated by the American Correctional Association, which were admitted without objection.  The third edition of the ACA's standards for Adult Correctional Institutions addresses cell size specifically.  It provides that each inmate, whether single occupancy or greater, should have 35 square feet of *unencumbered* space per occupant. (Pltf Ex. 48). And when confinement exceeds 10 hours per day, the standards require at least 80 square feet of total floor space per person.  *Id.*  When it comes to furnishings, the standards also require "a writing surface and proximate area to sit." *Id.*  These standards, while helpful, are voluntary and are used for the purpose of accreditation.  They provide "best practices." Consequently, even for an institution that has signed on to comply with the standards, they in no way establish the contours of the Eighth Amendment.  In this sense they are no difference than internal procedures, regulations, or even statutes. *See Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006).[5] Nevertheless, the standards do provide objective factors.  And in fact, the recommended cell dimensions, as well as the amount of time in the cell are, at minimum, factors capable of objective measurement.  As a result, they lend themselves to drawing clear cut lines.

It is clear that the cell sizes in North I, given the amount of time the inmates spend in the cells, fall far short of the standards recommended by the American Correctional Association.   And while not establishing the minimum constitutional

---

[5] The parties debate at length the relevance of an Illinois statute that provides that all new or newly remodeled institutions shall provide at least 50 square feet of cell space.  730 ILCS 5/3-7-3.  But the Court finds this statute of little help as it does not address the number of prisoners per cell (is three ok?).  Nor does it address the important issue of unencumbered floor space.

requirements, the standards should nonetheless illuminate what our evolving standards require.

It is obvious that inmates need exercise.  The cells in North I do not allow for exercise.  It is obvious that housing two inmates in a metal box where there is barely enough room to use the toilet or get out of the cell will, over any significant period of time, put the inmates at risk of severe mental distress.  It is obvious that housing violent felons in these conditions over lengthy periods of time will create substantial increased risk of violence between inmates and directed at staff.  And it is obvious that allowing inmates out of these cells for approximately 18 hours per week (when not on lockdown and the schedule is operating smoothly) is not enough to alleviate these conditions.

The Court need not ascertain what the constitutional minimum amount of space is for inmates that are double celled for such lengthy periods of time.  It is enough to say that 49.68 square foot cells with only 20.3 square feet of unencumbered space register well beneath the Eighth Amendment's floor.

Having determined that double celling inmates in North I creates conditions that objectively fail to provide the inmates with the minimum civilized measure of life's necessities, the Court must determine whether Warden Lashbrook was and is subjectively aware of those conditions.

Certainly, the Warden does not deny being aware of the size of the cells and the scheduled time out of those cells at Menard.  After all, she provided the Court with the

most reliable and up to date evidence on these points.  Importantly, in light of this knowledge, Warden Lashbrook testified that she believed the inmates in North I were being provided adequate space and time out of their cells.  So, must the Court accept this testimony despite its findings of objectively unconstitutional conditions that persist?  No.  As the Supreme Court has pointed out, the Court could conclude that the Warden knows of a substantial risk "from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842.  Furthermore, if the evidence establishes an inmate faces an objectively intolerable risk, a prison official "could not plausibly persist in claiming a lack of awareness."  *Id.* at 846, n. 9.  Here, the Court cannot account for Warden Lashbrook's testimony in light of the evidence in the case.  The Court has found that double celling in North I is objectively intolerable under the Eighth Amendment.  It deprives the inmates so confined with the minimum amount of living space necessary for a grown man and subjects them to a substantial risk of serious physical and mental harm.  The Court has concluded that these conclusions are so readily apparent that they would be obvious to the most casual observer.  The Court must conclude, therefore, that they are obvious to the prison officials at Menard, to include Warden Lashbrook.  Accordingly, Plaintiff has proven his claim against Warden Lashbrook that he was subjected to unconstitutional conditions of confinement when double celled in the North I cell house.

**Permanent Injunction**

Having determined the Mr. Turley has succeeded on the merits, the Court must determine whether it is appropriate to award injunctive relief. For a permanent injunction to issue, the plaintiff must show: (1) success, as opposed to likelihood of success on the merits; (2) irreparable harm; (3) the benefits of granting the injunction outweigh the harm to the defendant; and (4) the injunction is in the public interest. *ADT*, 672 F.3d at 498. Permanent injunctive relief is also only available where there is an ongoing or threatened violation of federal law. *Farmer*, 511 U.S. at 845 – 46 & n.9; *Vickery*, 100 F.3d at 1346.

Additionally, this case presents an added issue due to the fact that, not only is Mr. Turley no longer housed in the North I cell house, he has also been transferred to a completely separate facility – Hill Correctional Center. This raises the important question of whether this controversy is moot, or whether it is capable of repetition such that an injunction is necessary to insure that it does not. *Higgason v. Farley*, 83 F.3d 807 (7th Cir. 1996); *Maddox v. Love*, 655 F.3d 709, 714 (7th Cir. 2011). In cases where an inmate has been transferred to a new institution, the inmate has the burden of "making a reasonable showing that he will again be subject to the alleged illegality." *Higgason*, 83 F.3d at 811.

As to the first requirement, the Court has already determined that Mr. Turley has succeeded on the merits. The second requirement, however, irreparable harm, is

16

considerably more complicated, and is directly tied to the issue of whether Mr. Turley can demonstrate a reasonable probability that he will be retransferred to Menard.

When the Court directed supplemental briefing on this issue it directed the Defendant to provide Plaintiff with the appropriate information concerning the reason for Plaintiff's transfer to Hill Correctional Center.  Plaintiff has attached this information to his supplemental brief.    (Doc. 369-1). It consists of two pages of an Illinois Department of Corrections Transfer Report.  The first page appears to be the initial transfer request from 12/4/17.   It indicates that the type of action is "RECLASSIFICATION AND TRANSFER."  In response to the questions posed on item # 6 – INMATE WANTS TRANSFER ?  It is answered "No."  Under item #9 on page two, the reasons indicated for the transfer are; 1) Good Adjustment, 2) Visitation, and 3) Other programs.  There is an additional comments section that states:

> Offender has only had one superficial IDR in the last 6 years and has become a valued worker.  His current assignment is Inside Grounds Crew. Offender meets the criteria for under 30 years to transfer to a Medium Security Facility and transfer would enhance visitation.

As Plaintiff points out, the reasons relating to visitation make no sense.  He has not had any visitors for over 27 years and did not request the transfer to Hill in the first place.   A second explanation given is that Mr. Turley meets the criteria for under 30 years to transfer to a Medium Security Facility.  On its face, this seems like a simple, concrete, and non-pretextual reason for a transfer for which Plaintiff has no answer. But a quick review of the inmates at Hill Correctional Center that have cases currently

open in this district, reveals that at least one inmate who is detained at Hill, Ricky Patterson, still has 37 years remaining on his sentence.[6]   The final rationale for transferring Mr. Turley, good adjustment – to include time on an Inside Grounds Crew, does appear credible.  In fact the Court observed Mr. Turley working on the crew when it conducted the site visit in November of 2016.

Nevertheless, given the facts before the Court, the Court concludes that the other rationale provided for Mr. Turley's transfer are pretextual: Mr. Turley did not request the transfer, the transfer in no way facilitated visitation, and the supposed 30 year rule does not seem to actually apply, even when looking at the relatively small sample size of Hill inmates that currently have cases before the Court.   Because these other rationales appear to be pretextual, the Court does not assign much weight to Mr. Turley's adjustment as being responsible for the transfer.  In fact, it appears that it is equally probable that the transfer had something to do with the pendency of this case.

Accordingly, Plaintiff has made a showing of a reasonable probability that he will be retransferred back to Menard at some future date prior to the expiration of his sentence.  Moreover, should Mr. Turley be retransferred to Menard, the Court easily concludes that there is a reasonable probability that he would also be again housed, double celled, in North I.  Mr. Turley's history at Menard includes periods of prolonged housing in North I.  This includes a second stint that only recently concluded in May of 2016.  So this controversy is not moot.

---

[6] Mr. Patterson's offenses of conviction, sentence, and projected time remaining until paroled are all publicly available on the IDOC website (last visited 9/25/2018).

The Court next must consider whether, if Mr. Turley were to be retransferred to Menard North I, he would suffer irreparable harm. Again, the Court has no problem concluding that he would. Double celling Mr. Turley in North I would cause him to again suffer the very conditions the Court has found intolerable under the Eighth Amendment. It is not the type of isolated injury that can simply be cured with money damages. It is an ongoing condition that takes its' toll every day.

Next, the Court considers whether the benefits of granting the injunction outweigh any harm to the Defendant. Here, Mr. Turley has requested that the Court enjoin Warden Lashbrook from again double celling Mr. Turley in North I. Compliance with such an injunction would not require an affirmative act. In fact, it doesn't even require maintenance of the status quo. The Defendant argues that it is highly speculative whether Mr. Turley would ever be retransferred to Menard, let alone be housed again in North I. Consequently, from the Defendant's perspective, enjoining Defendant from again double celling Mr. Turley in North I would impose almost no burden at all. In any event, the possibility that Defendant would in some way be harmed is remote. First of all, the injunction places no restrictions on Mr. Turley's housing at Hill or any other of the numerous facilities to which he could be transferred in the future, other than Menard. In addition, if Mr. Turley were retransferred to Menard then the only restraint on the Warden's discretion in housing Mr. Turley is that he could not be *double celled* in North I. He could be housed, and double celled, in any other wing of the facility. He also could be housed in North I as long as he was single

celled.  The benefits of granting a narrowly tailored injunction, like the one Plaintiff requests here, are substantial.  It would prevent irreparable harm from being inflicted on Mr. Turley from housing him under inhumane conditions. The harm to the Defendant is minimal.  The Court therefore concludes that benefits of granting the injunction substantially outweigh any harm to the Defendant.

The Court also concludes that granting an injunction in this case is in the public interest.  Housing inmates in inhumane conditions that constitute cruel and unusual punishment under the Eighth Amendment to the Constitution cannot be condoned, or allowed to persist when such conditions are put before the Court.  Denying an injunction in this case would be anathema to the functions of this Court and contrary to the interests of justice.  Thus, the only conclusion the Court can draw is that an injunction would be in the public interest.

Finally, in order to comply with the PLRA, the Court must consider whether the intended injunction is "narrowly drawn, extends no further than necessary to correct the violation," and is "the least intrusive means to do so."  18 U.S.C. §3626(a)(1)(A).  The Court finds that the injunction requested by Plaintiff – that he not be double celled again in North I – falls comfortably within these requirements.  It is narrowly drawn in that it only prevents double celling in a single cell house.  That cell house being the one with the constitutionally deficient cells.  It is minimally intrusive and does not require any affirmative act at this time on the part of Menard's Warden or the Illinois Department of Corrections.

20

The Court therefore **GRANTS** Plaintiff's request for a permanent injunction.  The Defendant, Menard Warden Jacqueline Lashbrook in her official capacity, and any of her successors in their official capacity, is permanently **ENJOINED** from housing Plaintiff, Gregory Turley, in the North I cell house of Menard Correctional Center in a single cell with one or more other inmates or cellmates.

**IT IS SO ORDERED**

DATE: 9/26/2018

/s/ *Stephen C. Williams*

United States Magistrate Judge